# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BEVERLY ANN HARRIS,

                        Plaintiff,

v.

                                      Case No. 10-CV-1154-JPS

MICHAEL J. ASTRUE,
Commissioner of Social Security
Administration,

                       Defendant.              ORDER

In April 2006, Beverly Harris filed an application for Supplemental Security Income ("SSI"). (Tr. 112–16, 127). Ms. Harris alleged a number of conditions, including arthritis, several illnesses, and pinched nerves in her back, neck, and elbows. (Tr. 48–49, 127). The Commissioner of the Social Security Administration denied Ms. Harris' application, both initially and upon reconsideration. (Tr. 68–71, 74–77). After her claim was denied, Ms. Harris requested a hearing before an administrative law judge ("ALJ"). (Tr. 80). On July 23, 2008, ALJ Sayon held a hearing on the case. (Tr. 29–65). At the hearing, Ms. Harris was represented by counsel and a vocational expert testified. (Tr. 29–65). ALJ Sayon issued a decision on December 4, 2008, finding that Ms. Harris had the capacity to perform a variety of light work with a number of limiting conditions; as a result, the ALJ affirmed the Commissioner's denial of benefits. (Tr. 18–28). Finally, on October 22, 2010, the Appeals Council denied review and the decision became final. (Tr. 1–3).

Ms. Harris has appealed, challenging ALJ Sayon's decision. This Court reviews Ms. Harris' challenge and concludes that ALJ Sayon's decision must be affirmed.

1.    BACKGROUND

Due to the volume of factual and procedural history in this case, the Court will separate its narrative discussion of the case background into three separate parts: (1) Ms. Harris' background; (2) the relevant medical evidence; and (3) the procedural history in this case.

1.1    Ms. Harris' Background

Ms. Harris was forty-nine years old at the time of ALJ Sayon's decision. (Tr. 112). She has a tenth-grade education and little to no relevant work experience. (Tr. 134).

Alleging pain dating back to 1996, Ms. Harris requested SSI (Tr. 48–49). She indicated that she suffers from: arthritis in her hands; pinched nerves in her back, neck, and elbow; illnesses such as diabetes and hepatitis C; and, high blood pressure. (Tr. 48–49, 127). Plaintiff stated that, due to these conditions – and particularly the pinched nerve in her back – she was unable to stand or sit for long periods. (Tr. 155–156). To cope with this pain, Ms. Harris would occasionally use a cane, take medication, sit in a hot bath, or use a heating pad. (Tr. 49, 156). Ms. Harris has stated that she can remain sitting for only one to two hours, stand approximately half-an-hour, and walk a block at maximum. (Tr. 57).

Ms. Harris also indicated additional problems. She stated that the pinched nerve in her neck caused severe headaches. (Tr. 50). She alleged that, as a result of the arthritis in her hands and pinched nerve in her elbows, she had difficulty using her hands. (Tr. 50–51, 155). Ms. Harris used wrist splints to alleviate the arthritis pain, but neglected to use the elbow pads she received because they shrunk in the wash. (Tr. 51).

In her testimony before ALJ Sayon, Ms. Harris stated that her illnesses caused very little difficulty in comparison to her other physical problems. (Tr.

51–52). Her diabetes was of practically no concern. (Tr. 51). Her hepatitis, on the other hand, had caused her to become incoherent on a few occasions – likely as a result of taking too much pain medication. (Tr. 52).

Ms. Harris also testified that she had been dealing with mental health problems in addition to her physical problems. (Tr. 54, 56–57, 530). She stated that she had been dealing with depression for approximately a year, and that she also had begun having problems with memory and concentration. (Tr. 530). Additionally, Ms. Harris testified that she been sentenced to probation for altering a prescription form and had been convicted of obtaining a controlled substance by fraud in 2005. (Tr. 54, 176–180).

Ms. Harris lived with family members, including a teenage nephew and toddler niece. (Tr. 45, 155). She cared for her niece, often with the assistance of her nephew or son. (Tr. 45–46). Ms. Harris' daily activities consisted mainly of watching movies, shopping, reading, doing crossword puzzles, and limited cooking and housework. (Tr. 156–60). Ms. Harris rarely leaves the house, going to the store twice a month and church even less frequently. (Tr. 168). Occasionally, friends and family members visit. (Tr. 160). Ms. Harris' sister indicated that she spent several hours a day with Ms. Harris to help her perform daily tasks. (Tr. 164).

### 1.2    Relevant Medical Evidence

#### 1.2.1    Ms. Harris' Physical Conditions

##### 1.2.1.1 Back and Neck

On numerous occasions, Ms. Harris has gone to the ER for back and neck problems; during these visits, only minor degenerative changes have been noted. (Tr. 222–30, 234–35, 236–45. 434–38, 1032–40). In November 2005, Ms. Harris' back was said to look muscular. (Tr. 236). A January 2006 X-Ray showed mild degenerative changes. (Tr. 234–35). Similarly, in April 2006, Ms.

Harris exhibited only minimal tenderness, had positive leg raising, and suffered no sensory or motor deficits of the lower extremities. (Tr. 434). Later in April 2006, a CT scan did show a disc bulge on her spine; this was not accompanied by any changes to her gait or sensation, though, which remained normal and intact. (Tr. 339, 463–64). Another CT scan, in March 2008, showed the same bulging disk. (Tr. 742).

Beginning in 2006, Ms. Harris began to see Nosheen Hasan, M.D., a pain management doctor. (Tr. 751–90, 808–42, 852–80, 898–921). To treat her back and neck pain, Dr. Hasan began a program of physical therapy, home exercise, heat, epidural injections, and pain medications. (Tr. 620–48, 752–90, 808–42, 852–80, 898–921). Harris told Dr. Hasan that her pain medications helped to relieve her pain by fifty percent. (Tr. 799). She also stated that a lumbar epidural she received in March 2008 had provided eighty percent relief. (Tr. 766).

After these treatments, Ms. Harris was found to have some lumbar tenderness but normal strength. (Tr. 758).

### 1.2.1.2 Hands, Wrists, and Arms

Ms. Harris has suffered from carpal tunnel syndrome in her wrists and arthritis in her hands. (Tr. 252–64). In April 2005, she received a diagnosis of bilateral cubital tunnel syndrome and bilateral carpal tunnel syndrome. (Tr. 253). She was given Redi-Grips and wrist splints to help treat this condition. (Tr. 250, 252). A year later, in 2006, she received an additional diagnosis of mild bilateral ulnar neuropathy in her elbow, and mild right cervical radiculopathy. (Tr. 249, 302). Ms. Harris' doctor determined that these problems were not severe. (Tr. 248). Dr. Lewis Chamboy also concluded that, while Ms. Harris would benefit from surgery, any such surgery could wait. (*Id.*) Chamboy asked Ms. Harris to return for an exam in six months and to

wear her wrist splints at night – Harris later admitted that she did not wear her splints during this time. (Tr. 647).

### 1.2.1.3 Hepatitis and Diabetes

From 2005 until 2007, Ms. Harris saw a doctor to evaluate her for hepatitis B and C. (Tr. 322, 619–47, 1041). She was diagnosed with both forms of hepatitis and began to see a doctor for treatment. (Tr. 619–47). Her main symptom was fatigue. (Tr. 322).

During the same time period, Ms. Harris received treatment for her diabetes from Dr. Jeffrey Maehl (Tr. 463). Her blood sugar was well-controlled and she did not complain of any major symptoms, such as visual complaints, polyuria, polydipsia, or polyphagia. (*Id.*) From 2006 until 2007, Ms. Harris typically took her medication, but did not comply with Dr. Maehl's request that she see an ophtalmigist or podiatrist. (*Id.*) Because she was compliant with her medication, Ms. Harris' diabetes remained controlled. (Tr. 626–48). In April 2008, though, Ms. Harris told Dr. Maehl that she had stopped her medication and did not check her blood sugar; despite this, her sugars were controlled. (Tr. 620–21).

### 1.2.2   Medical Opinions: Physical

### 1.2.2.1 Mina Khorshidi, M.D. (June 8, 2006)

Dr. Khorshidi, a state agency physician, assessed Ms. Harris' ability to perform tasks and found that Harris could perform many motions. (Tr. 403–409). Generally, Khorshidi stated that Harris could perform light exertional work. (*Id.*) As part of this, Khorshidi opined that Harris could perform frequent handling, stooping, and crouching (though Khorshidi accidentally checked the wrong boxes on a form). (Tr. 404). Additionally, Khorshidi found that Harris had a limited ability to feel and reach in all directions. (Tr. 406). Finally, Khorshidi noted that Harris had reduced grip

and pinch abilities, but that Harris did not want surgery to correct the problem. (Tr. 403).

In reaching these conclusions, Khorshidi relied on a plethora of evidence regarding Harris' mild bilateral cubital/carpal syndrome, low back pain, hepatitis C, non-severe hypertension, lumbosacral tenderness, normal back strength, positive leg raising, and the April 2005 CT scan of Harris' spine.

### 1.2.2.2 Michael Baumblatt, M.D. (August 16, 2006)

Dr. Baumblatt reviewed the evidence and Dr. Khorshidi's study and concluded that Harris could perform "medium exertion work with limited fingering." (Def.'s Mem., 8 (citing Tr. 478–80)).

### 1.2.2.3 Jeffrey Maehl, M.D. (August 12, 2008)

Plaintiff's physician, Dr. Maehl, evaluated Ms. Harris' functional capacities nearly two years later. At that time, he formed a number of opinions regarding Ms. Harris' conditions: (1) she could not stand and walk for more than fifteen minutes at a time or during an eight-hour workday; (2) she could not lift any weight; (3) she could not use either hand for simple grasping or fine manipulation; (4) she could not use either foot repetitively to operate foot controls; (5) she could not work above shoulder level, due to an inability to bend/twist/turn at the waist, squat, crawl, climb, push, or pull; (6) she should avoid any excessive heat or cold. (Tr. 1098–99). Maehl stated that his evaluation had been accurate for six months. (Tr. 1099).

### 1.2.3 Ms. Harris' Mental Conditions

Ms. Harris was treated for mental health conditions at Acacia Clinic between April 2005 and January 2008. (Tr. 267–96, 584–613, 616–18). During her treatment, Ms. Harris was diagnosed with a mood disorder NOS, depression, anxiety disorder NOS, and polysubstance abuse (in early

remission). (*Id.*) Lauren Nelson, Ph.D., has treated Ms. Harris; Anna Kajuch, M.D. has followed Ms. Harris to monitor her medications. (Tr. 267–96). Harris' mood was often effected by her stress levels, with improvement seen when her stress level diminished. (Tr. 270–77, 282)

### 1.2.4 Medical Opinions: Mental

#### 1.2.4.1 Keith Bauer, Ph.D. (June 19, 2006)

Dr. Bauer, a state agency psychologist, diagnosed Ms. Harris with a mood disorder NOS, an anxiety disorder NOS, and polysubstance abuse. (Tr. 323–36). Bauer believed that these conditions resulted in: (1) mild limitations in daily activities and social functioning; and (2) moderate difficulties in concentration, persistence, and pace. (*Id.*)

Dr. Bauer also completed a mental RFC assessment, considering notes on Harris' mood from Drs. Kajuch and Nelson. (Tr. 448, 450–52). In his assessment, Dr. Bauer concluded that Harris was able to perform unskilled, routine work. (Tr. 448). After reviewing the evidence and Dr. Bauer's report, another state agency psychologist affirmed Dr. Bauer's opinions.

#### 1.2.4.2 Lauren Nelson, Ph.D. (September 27, 2006)

Later in 2006, Dr. Nelson prepared a report (co-signed with Dr. Kajuch) in which she diagnosed Harris with panic disorder, major depression–recurrent, and history of polysubstance abuse in remission. (Tr. 486–87). Dr. Nelson also noted that Harris had some additional problems: difficulty concentrating, difficulty reading, difficulty focusing on complex tasks, and short-term memory problems. (Tr. 487). Despite these problems, Dr. Nelson also found that Harris' thought processes were logical and her long term memory satisfactory. (*Id.*). Dr. Nelson stated that Harris' memory and concentration problems made it difficult for Harris to carry out instructions. (Tr. 486). Due to these problems, Dr. Nelson concluded that

Harris was unable to respond to supervision, co-workers, or work pressures. (*Id.*)

### 1.3. Procedural History

As noted above, Ms. Harris first filed her SSI application in April 2006. (Tr. 112–17, 127). The Commissioner of the Social Security Administration denied her application initially and upon reconsideration. (Tr. 66–71, 74–77). Seeking to have the Commissioner's decision overturned, Ms. Harris requested a hearing before an ALJ. (Tr. 80). On July 23, 2008, ALJ Sayon held a hearing on Harris' denial, at which Harris was represented by counsel. (Tr. 29–65).

#### 1.3.1 Ms. Harris' Testimony

At the hearing, the plaintiff testified. In her testimony, she first provided general background about her family life, education, and income. (Tr. 45–47). Ms. Harris also testified to her pain, cataloguing the pain in her back, neck, head, hands, and wrists. (Tr. 48). She stated that her back pain had begun in 1996, following a fall from a ladder. (*Id.*) She characterized the pain as a "10" on bad days, and an "8" on an average day. (Tr. 49) Ms. Harris also described her treatment by the pain doctor, Dr. Hasan, and her use of a TENS unit, medication, hot baths, and heating pads. (*Id.*)

Harris then discussed her neck and head pain. She stated that, since 2005, she had suffered from neck pain which often caused bad headaches that could last up to 3 weeks at a time. (Tr. 50). She discussed the medication she took to treat this condition, which included Excedrin and doctor-prescribed Imitrex. (*Id.*)

Ms. Harris then turned to discussing the pain in her hands and arms. She testified that she has a pinched nerve in each elbow and arthritis in her hands. (*Id.*) Ms. Harris stated that she had received wrist splints and elbow

pads to treat the resulting pain. (*Id.*) Ms. Harris also informed the ALJ that she had not worn the splints or pads since they had shrunk in the wash.

After discussing her pain, Ms. Harris began to discuss her illnesses. She testified that she has diabetes, which she took pills to control. (Tr. 51–52) She also stated that she has asthma, which effects her most in dusty or hot conditions. (*Id.*) Finally, Ms. Harris informed the ALJ of her hepatitis B, hepatitis C, and liver problem. (*Id.*)

In discussing her physical health, Ms. Harris also gave testimony about an occasion when she went to the ER because she was disoriented. (*Id.*) At the ER, she was told that she should stop taking so much of her pain medication. (*Id.*)

Ms. Harris was also asked about her compliance with doctor's orders to take medication. (Tr. 54). In response to these questions, Ms. Harris explained that she did not always take her diabetic medications, because her blood sugar would often drop to low level; after her doctor checked her blood sugar levels and found them satisfactory, he allowed her to stop taking her medications. (*Id.*)

Discussing her mental health, Ms. Harris also stated that she suffers from depression, and discussed her history of mental health treatment. (Tr. 52–53).

Ms. Harris also discussed her conviction for narcotic prescription fraud. She testified that, at the time she was convicted, she was living with a person who would use her pain medication. (Tr. 53). Harris stated that she altered the prescription form and attempted to get a refill that she could hide somewhere in her house. (*Id.*)

Finally, Ms. Harris testified to her current condition. She listed her everyday activities and discussed her ability to do chores and other physical

activities.[1] Discussing her physical condition, Ms. Harris stated that many of her daily tasks were difficult and painful. (Tr. 56–59). She testified that her pain persisted despite several injections that she had received, that she often needs a cane when she moves about, and that she has difficulty sleeping at night even when she takes her pain medications. (Tr. 59–60).

### 1.3.2    Vocation Expert Testimony

Finally, a vocational expert ("VE") provided testimony concerning job opportunities in Wisconsin that a person with Ms. Harris' characteristics could perform. (Tr. 29–65).

First, ALJ Sayon asked the VE to state the number of jobs available in Wisconsin that could be performed by someone, such as Ms. Harris, with the following characteristics: (1) of the same age and education as Ms. Harris; (2) with no past relevant work experience; (3) able to perform a range of medium work involving only simple, routine, repetitive low-stress, unskilled activities; (4) with limited abilities, including frequent handling and occasional stooping and crouching. (Tr. 37). Given these parameters, the VE stated that Ms. Harris could perform the following jobs in Wisconsin: (1) 24,000 custodial jobs at varying exertional levels (from light to medium); (2) 18,000 general production jobs at varying exertional levels (from light to medium); and (3) 21,000 handpacking jobs at varying exertional levels (from light to medium). (Tr. 37–39).

Next, the ALJ asked the VE to state the number of jobs available if a "sit/stand" option were added. (Tr. 40). The VE testified that the addition of a sit/stand option would reduce the light general production and hand packaging jobs by fifty percent. (*Id.*)

---

[1]For a list of Ms. Harris' activities and abilities, see section I.A, *infra.*

In her last question to the VE, ALJ Sayon asked how many jobs would be available if the same limitations were considered, but the work was limited to sedentary activities. (*Id.*) The VE stated that 2,000 production jobs and 1,500 hand packaging jobs would be available with such limitations. (*Id.*)

Ms. Harris' attorney then asked the VE to consider the same limitations and to add the following characteristics: (1) moderate limitations in ability to maintain attention and concentration for extended periods; (2) moderate limitation in maintaining regular attendance and being punctual; (3) moderate limitation in completion of a normal workweek or workday without interruptions from psychologically-based symptoms; and, (4) moderate limitation in ability to perform work at a consistent pace. (*Id.*) Ms. Harris' attorney clarified that "moderate" was meant as zero to one-third of the time. (Tr. 41).

The VE stated that, given those limitations, it would be difficult for a person to sustain employment. (Tr. 42). The VE clarified that one to two absences per month (but not in consecutive months) would be tolerated, and that light and sedentary jobs could be performed even if the individual needed to use a cane. (Tr. 42–43, 63–64).

2.    STANDARD OF REVIEW

Typically, when reviewing an ALJ-issued final determination of the Commissioner, a court must accept all of the Commissioner's factual findings as conclusive. 42 U.S.C. § 405(g). The reviewing court may only reverse the final determination if the court finds it is not supported by substantial evidence or resulted from harmful legal error. *Id.*; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

In reviewing the final decision, the reviewing court must examine the entire record and affirm the decision if it finds "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidate Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). *See also Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992), *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477–487 (1951), *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

The reviewing court must affirm the Commissioner's findings even if it believes that the evidence could substantially support other findings. *Arkansas*, 503 U.S. at 113. The reviewing court cannot engage in re-weighing the evidence and substitute its own judgment for the Commissioner's. *Powers*, 207 F.3d at 434-35. Rather, "where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility" lies with the ALJ to make the decision – not with the district court. *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993).

While this standard is generous to the ALJ's decision, there are situations in which the reviewing court may reverse the decision. The district court may remand where the ALJ's decision: (1) lacks an "accurate and logical bridge" to the evidence; or (2) is poorly articulated, such that it prevents meaningful review. *Steele v. Barnhart*, 290 F.3d 936, 940–41 (7th Cir. 2002). At the same time, "conclusions of law are not entitled to deference," and when an ALJ commits an error of law, the district court must reverse the ALJ's decision. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

3.    ISSUES

3.1    Whether substantial evidence supported the ALJ's RFC finding, under Social Security Ruling (SSR) 96-8p.

3.2    Whether substantial evidence supported the ALJ's credibility finding, under SSR 96-7p.

3.3     Whether gave appropriate weight to the opinions of Ms. Harris'
treating doctors, under SSR 96-2p.

       3.3.1   Whether the ALJ failed to consider limitations
supported by medical evidence in posing hypothetical
questions to the VE.

4.     DISCUSSION

4.1     RFC Finding (SSR 96-8p)

Under SSR 96-8p, an ALJ must provide an assessment of a plaintiff's
work abilities prior to making a residual functional capacity ("RFC") finding.
Ms. Harris alleges that, under SSR 96-8p, the ALJ's assessment must be a
function-by-function analysis. (Pl.'s Br., 14–19).

SSR 96-8p does not require a strict function-by-function analysis of all
of a plaintiff's work abilities, as Ms. Harris argues. Rather, SSR 96-8p requires
that ALJ Sayon simply "describe the maximum amount of each work-related
activity" that Ms. Harris could perform based upon the evidence, along with
an explanation of "how any material inconsistencies or ambiguities in the
evidence . . . were considered and resolved."

ALJ Sayon certainly satisfied this requirement. In reaching a
conclusion on Ms. Harris' ability to work, ALJ Sayon considered and
discussed Harris' symptoms and limitations, along with the related medical
findings and physician opinions. (Tr. 22-26).

4.1.1     Functional Limitations

Arguing that the ALJ failed in this regard, Harris alleges that the ALJ
did not "identify Plaintiff's functional limitations or restrictions and assess
her exertional and non-exertional work-related abilities." Harris is correct
that ALJ Sayon did not "specify how long the plaintiff could sit, stand, walk,
push, or pull."

But despite that shortcoming, ALJ Sayon did offer a specific regulation under which she concluded that Harris could perform work. (Tr. 21 (citing 20 C.F.R. § 416.967(b))). That regulation, along with SSR 83-10, specify clear limitations on the activities that workers can perform, including time limits on standing or walking. ALJ Sayon went even further, concluding that Harris could only work jobs with further specific limitations such as routine, repetitive, low stress jobs with only occasional stooping and crouching and frequent but not constant handling. (Tr. 21). In discussing her conclusion, ALJ Sayon specifically referenced Harris' symptoms, the medical evidence, and the physicians' opinion.

Thus, ALJ Sayon complied with SSR 96-8p by, in effect, describing the maximum amount of work activities and adding other limitations to the jobs that Harris could work. And, as Ms. Harris notes in her brief, "the court need not remand in search of a perfectly drafted opinion," but should reverse where it has reservations as to whether an issue was fully addressed. (Pl.'s Br. (citing *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002))). ALJ Sayon's opinion may not be perfect, and it would certainly help to have the ALJ state the specific maximums she concluded that Harris could work. But, ALJ Sayon did provide a specific regulation and further limitations under which Harris could work. When combined, the ALJ's statements erase any reservations that this Court could have as to whether an issue was fully addressed. The ALJ's discussion complied with SSR 96-8p in considering and describing Harris' functional limitations.

### 4.1.2   Harris' Use of a Cane

Next, Harris alleges that ALJ Sayon did not discuss Harris' need for a cane. (Pl.'s Br. 15–16). On this point, Harris is simply wrong.

As the Commissioner correctly points out in his brief, ALJ Sayon expressly considered Harris' need for a cane, concluding that jobs exist in Wisconsin that Harris could perform even with her need for a cane; the ALJ based this conclusion on the testimony of the VE. (Tr. 26–27, 63–64).

### 4.1.3   Medical Evidence

Harris next takes issue with portions of the ALJ's decision, arguing that they are not adequately supported by specific medical and non-medical facts. (Pl.'s Br. 16–17). Again, the Court respectfully disagrees with Harris' contentions.

Specifically, Harris points to several failings on ALJ Sayon's part. First, Harris states that the ALJ did not specify where the opinions of Drs. Khorshidi or Baumblatt were consistent with the record. Second, Harris argues that the ALJ's assessment varied from the opinions of Drs. Khorshidi, Baumblatt, and Maehl, without specifying the exact portions of the statements which she accepted or rejected; therefore, Harris alleges that the ALJ failed to build an accurate and logical bridge from the evidence to the result.

As the Commissioner correctly points out, ALJ Sayon gave adequate weight to the medical opinions of Drs. Khorshidi and Baumblatt, thus complying with SSR 96-8p. In fact, contrary to Harris' contentions, the ALJ's assessment is largely consistent with the opinions of Drs. Khorshidi and Baumblatt. In June 2006, Dr. Khorshidi stated that Harris could perform light exertional work with frequent handling, occasional stooping and crouching, and limitations on reaching and feeling. (Tr. 403–04). The ALJ's RFC of light work, including additional limitations, is thus largely consistent with Dr. Khorshidi's opinion.

Case 2:10-cv-01154-JPS   Filed 09/29/11   Page 15 of 24   Document 19

Further, in August 2006, Dr. Baumblatt stated that Harris could perform medium exertional work with limited fingering. (Tr. 478–480). The Commissioner correctly points out that, while the ALJ did not employ the recommended limited fingering in her RFC, she provided an adequate, medically-based reason for not including such limitation: that a March 2006 EMG showed only mild carpal tunnel and ulnar neuropathy. (Def.'s Mem., 13–14 (citing (Tr. 299))). Harris' doctor even confirmed that the carpal tunnel and neuropathy findings were not severe. (Tr. 248). Going further into her justifications for not including a light fingering limitation, the ALJ considered that Harris did not wear her wrist splints, did not wear her elbow brace, and was able to complete tasks such as cooking, washing dishes, folding laundry, and sending emails. (Tr. 51, 55–56, 647).

The ALJ also provided adequate support for her rejection of Dr. Maehl's opinion. Dr. Maehl offered an opinion that Harris should be limited to less than a full range of sedentary work because she could not work *any* hours during an eight-hour workday. Practically the entire discussion that ALJ Sayon engaged in supports her rejection of this claim. Aside from the evidence already discussed above, which indicated that Harris could work certain jobs with limitations on physical activities, the Court also discussed Harris' treatment and generally mild back problems. For example, the ALJ considered the reports finding only mild degenerative changes and problems, and her conservative treatment. (Tr. 24, 234–236, 339, 346, 752–90, 808–42, 852–80, 898–921). This evidence provided the ALJ with a reasonable, accurate, and logical bridge to her conclusion that these problems were not disabling and that Harris retained the ability to perform light work.

### 4.1.4   Mental Health

Finally, with respect to the RFC, Harris alleges that the ALJ made two incorrect conclusions related to Harris' mental abilities. First, Harris argues that the ALJ improperly concluded that Harris had only a mild limitation in daily living activities. (Pl.'s Br., 17–18). Second, Harris argues that the ALJ erred in concluding that an RFC of routine work could accommodate for problems in concentration, persistence, and pace. (Pl.'s Br., 18–19 (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010))). The Court must again side with the Commissioner and find that ALJ Sayon acted appropriately in reaching these conclusions.

First, the ALJ made a reasonable determination, based upon the record, that Harris had only mild limitations of her daily activities and functioning. While Harris is correct that ALJ Sayon did find some severe mental impairments of depression, anxiety disorder and substance abuse (Pl.'s Br., 17 (citing (Tr. 20))), there is ample acceptable evidence to demonstrate Harris' mild limitations. In reaching her conclusion of mild limitations of daily activities and function, ALJ Sayon cited to Harris' abilities to engage in the following activities: cooking, cleaning, doing laundry, shopping, reading novels, doing crossword puzzles, paying bills, sending emails using a computer, watching television, running errands, and providing care for a two-year-old niece. (Tr. 21, 45, 55–56, 156–60, 164–68). ALJ Sayon also recounted evidence of Harris' ability to function socially, such as ability to engage with family members and others, visiting with family several times per week, and attending church. (Tr. 160, 168). The ALJ acknowledged Harris' tendency to isolate herself, but ultimately found – based on the evidence just mentioned – that Harris had only mild limitations to function socially.

Case 2:10-cv-01154-JPS   Filed 09/29/11   Page 17 of 24   Document 19

In addition to the evidence discussed by the ALJ, the opinion of Dr. Bauer supports the ALJ's findings. While Dr. Nelson's opinion would seem to conflict with the ALJ's findings, an ALJ is not required to accept an opinion that is inconsistent with other record evidence. 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight" should be given to that opinion). ALJ Sayon's opinion is clearly supported by the record, despite conflicting with the statements of Dr. Nelson, as evidenced by ALJ Sayon's extensive recounting of the record evidence supporting her opinion. (*See* Tr. 21, 45, 55–56, 156–60, 164–68). For these reasons, this Court finds that the ALJ reached her conclusions reasonably, basing such conclusions on the evidence in the record.

Harris goes further, though, challenging ALJ Sayon's reliance on evidence of social interaction with family and friends as evidence that Harris is not disabled. (Pl.'s Br. 18). Citing *Carradine v. Barnhart*, Harris argues that "one can be disabled and yet get together with family or friends from time to time." (Pl.'s Br. 18 (citing *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004))). The portion of *Carradine* to which Harris cites does not apply here, though; that portion of *Carradine* holds that a plaintiff should not be considered *physically* able, merely because he or she can engage with family and friends. *Carradine*, 360 F.3d at 756. ALJ Sayon's decision, on the other hand, examined Harris' ability to engage with family and friends as proof of her *mental* capabilities. (Tr. 160, 168). From the record evidence of social interaction, ALJ Sayon formed the reasonable and permissible opinion that Ms. Harris suffered only mild limitations in daily living activities and social engagement. (*Id.*)

Second, Ms. Harris argues that ALJ Sayon's RFC finding of simple, routine, repetitive, low-stress, and unskilled work did not account for Harris'

Case 2:10-cv-01154-JPS   Filed 09/29/11   Page 18 of 24   Document 19

moderate limitations in concentration, persistence, and pace. (Pl.'s Br. 18–19). Relying on *O'Connor-Spinner v. Astrue*, Harris suggests that routine, simple work does not satisfy the limitations caused by depression-related deficiencies in concentration, persistence, and pace. (Pl.'s Br. 18 (citing *O'Connor-Spinner*, 627 F.3d 614)).In other words, Harris argues that she should not be expected to be capable of doing such low-stress work when she has depression-related problems.

Again, Harris appears to mischaracterize the authorities she cites. *O'Connor-Spinner* does not stand for the proposition that simple, routine, low-stress, and unskilled work *cannot* account for moderate limitations in concentration, persistence, and pace. *See Id.*, at 619–20. Rather, the *O'Connor-Spinner* court was concerned with ensuring that an ALJ's hypothetical questions would cause the VE to appropriately eliminate any positions that the plaintiff is incapable of performing. *Id.*, at 620–21. The real concern is that the ALJ should establish substantial evidence to support a conclusion that the RFC assessment takes only jobs which the plaintiff can work into consideration. *Id.* ("the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do"). Thus, to put it as succinctly as possible – so long as the ALJ accounts for a plaintiff's limitations in posing hypotheticals to the VE and relies on substantial evidence in reaching an RFC opinion, the reviewing court should affirm the ALJ's decision.

ALJ Sayon's decision ultimately complied with these requirements. Unfortunately, ALJ Sayon, herself, did not pose a hypothetical question to the VE that would cover Harris' limitations in concentration, persistence, and

Case 2:10-cv-01154-JPS   Filed 09/29/11   Page 19 of 24   Document 19

pace. Harris' own attorney *did* pose such a question, though, asking the VE to restrict the answer to jobs that could accommodate person with the following limitations: (1) moderate limitations in ability to maintain attention and concentration for extended periods; (2) moderate limitation in maintaining regular attendance and being punctual; (3) moderate limitation in completion of a normal workweek or workday without interruptions from psychologically-based symptoms; and, (4) moderate limitation in ability to perform work at a consistent pace. (Tr. 40–41). These questions cover Harris' limitations in concentration, persistence, and pace. Thus, ALJ Sayon was able to rely on such information, in combination with the opinions of Drs. Bauer and Kajuch, in reaching her RFC assessment of Ms. Harris. (Tr. 24, 27, 271–96, 333, 448, 486–488).

Though it is a close case – because ALJ Sayon did not specifically ask the VE to restrict his jobs opinion based on Harris' limitations in concentration, persistence, and pace – the information was eventually elucidated. (Tr. 40–41). Under *O'Connor-Spinner*, it is the testimony of the VE as a whole that matters. *See* 627 F.3d at 620-621. So long as the reviewing court is "assure[d] that the VE's testimony constitutes substantial evidence of the jobs that the claimant can do," *O'Connor-Spinner* is satisfied. *Id.*, at 621.

Based upon the VE's responses to both the ALJ's and the plaintiff's attorney's questions, this Court is assured that the VE's testimony is substantial evidence of the jobs Ms. Harris is able to perform. In combination with the other evidence considered by ALJ Sayon, the Court is convinced that the ALJ's decision is reasonably based on substantial evidence and should stand.

### 4.2 Credibility Finding (SSR 96-7p)

Ms. Harris also contends that the ALJ erred in determining that Harris was not credible. (Pl.'s Br. 21–24). She argues that the ALJ based that decision only on Ms. Harris: (1) showing up for her hearing late; (2) being evasive during questioning; and (3) lacking extensive work history. (Pl.'s Br. 21). Ms. Harris goes on to claim that the transcript does not support the ALJ's characterization of Harris as evasive; she also argues that the ALJ incorrectly considered her lack of work history and the inconsistencies between her claims and the medical record. (Pl.'s Br., 21–22).

In fact, ALJ Sayon based her credibility determination on a broader basis than plaintiff claims, and drew appropriate and correct inferences from the record. The ALJ found that Ms. Harris was not credible because: (1) she had showed up late for the hearing; (2) was evasive during questioning; (3) had never worked; (4) had received only conservative treatment; (5) had never required or undergone surgery; (6) had been noncompliant with treatment; and, (7) had been convicted of narcotic prescription fraud in 2005. (Tr. 25, 176–180, 221–64, 297–322, 337–85, 432–41, 454–67, 474, 489–583, 619–61, 706–944, 1032–1099). Considering those six items, the ALJ clearly based her credibility determination on far more than Harris claims.

Furthermore, in reaching a credibility determination, the ALJ relied on appropriate considerations. It was permissible for the ALJ to consider Harris' conservative treatment, the inconsistency of her claims with medical evidence, and her noncompliance with treatment. 20 C.F.R. §§ 416.929(c)(2), (3)(iv), (3)(v), (3)(vii). It was also permissible for ALJ Sayon to consider Harris' past drug-seeking behaviors. *Kellems v. Astrue*, 2010 WL 2640190, at *3 (7th Cir. June 29, 2010). ALJ Sayon also appropriately considered Harris' evasiveness, which she could observe through Harris' physical movements

during the hearing – even if no evasiveness appears on the face of the transcripts. *See Kelly v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989), *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) (citing *Wolfe v. Shalala*, 997 F.2d 321, 327 (7th Cir. 1993)). Further, even if there was not enough evidence to establish evasiveness, there was more than adequate other evidence from which ALJ Sayon could reasonably reach her decision to discount Harris' credibility.

Finally, Harris argues that ALJ Sayon inappropriately weighed Harris' daily activities against her credibility, while ignoring the qualifiers of those activities. (Pl.'s Br., 23–24). The ALJ certainly did consider those activities, and Harris is correct that the ALJ did not discuss Harris' limitations in completing them. (Tr. 21, 45, 55–56, 156–60, 164–68). But, the Court agrees with the Commissioner that – even with the limitations to those activities that Ms. Harris alleges – Ms. Harris' ability to perform daily activities does not square with her argument that she is completely disabled. (Def.'s Mem., 20).

Given the evidence considered by the ALJ, the Court must uphold the credibility determination. A court should not overturn a credibility finding unless it is patently wrong. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Furthermore, courts should affirm credibility determinations, so long as the determinations are supported by the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Because ALJ Sayon offered extensive permissible evidence from the record in reaching the credibility determination, this Court will not overturn her decision.

### 4.3    Opinion of Dr. Maehl (SSR 96-2p)

Stated in short, Ms. Harris argues that ALJ Sayon rejected Dr. Maehl's opinion without adequate support or explanation. Harris correctly states that the opinion of a treating physician should receive special consideration. (Pl.'s

Br., 19 (citing *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D. Wis. 2001))). She also argues correctly that an ALJ must give good reasons for any decision she makes regarding the weight given to a treating source's opinion. (Pl.'s Br. 19 (citing *Wates v. Barnhart*, 274 F.Supp.2d 1024, 1034 (E.D. Wis. 2003)(quoting 20 C.F.R. § 404.1527(d)))). However, the weight given to an opinion should scale such that the opinion receives less weight the greater the amount of inconsistencies it has with the medical evidence on record. 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we give to that opinion."). In other words, the less consistent a medical opinion is to the record, the less deference it should receive. *Id.*

Here, the Court finds that ALJ Sayon provided adequate reasons for her decision to discount the opinion of Dr. Maehl. ALJ Sayon gave little weight to Dr. Maehl's opinion, because she found that it was not well-supported by the medical evidence of record or even by the testimony of Ms. Harris. (Tr. 25, 57). ALJ Sayon was not required to provide a comparison of the opinions of each doctor. Rather, she examined the evidence as a whole and accepted relevant consistent portions of each, complying with 20 C.F.R. § 404.1527(d)(4). (Tr. 25). The ALJ considered each of the opinions of the medical experts and accommodated the limitations she believed were reasonably indicated by the evidence as a whole. (Tr. 25). ALJ Sayon also considered Harris' testimony that indicated she was not as restricted as Dr. Maehl had stated. (Tr. 57).

Considering the ALJ's discussion of the evidence in the record – specifically the conflicting medical opinions and the conflicting testimony of Ms. Harris (Tr. 25, 57) – the Court finds the ALJ's treatment of Dr. Maehl's opinion to be reasonably supported by the evidence of record.

5.    CONCLUSION

For the reasons set forth above, the Court affirms the decision of the ALJ.

Accordingly,

IT IS ORDERED that the ALJ's decision be and the same is hereby AFFIRMED, and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge